**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

| | |
|---|---|
| **KIMBERLY BROWN** | Civil Action No.: |
| 101 Waldon Road | |
| Abingdon, Maryland 21009 | |
| *Resident of Harford County* | |
| | |
| Plaintiff, | Collective Action Claim |
| | |
| ***Individually and on Behalf of All*** | |
| ***Similarly Situated Employees*** | |
| | |
| v. | <u>Jury Trial Requested</u> |
| | |
| **DRS. COHEN & NORTON, P.A., D/B/A** | |
| **THE FOOT CENTER OF BEL AIR** | |
| 2208 Old Emmorton Road, Suite 101 | |
| Bel Air, Maryland 21015 | |
| | |
| Serve:  Adam J. Chavis, R.A. | |
|         14 Blacksmith Court | |
|         Baltimore, MD  21136 | |
| | |
| and | |
| | |
| **DR. PHILLIP M. COHEN** | |
| 3600 Anton Farms Road | |
| Pikesville, MD 21208 | |
| *Resident of Baltimore County* | |
| | |
| and | |
| | |
| **DR. NANCY M. NORTON** | |
| 805 Champions Court | |
| Reisterstown, MD, 21136 | |
| *Resident of Baltimore County* | |
| | |
| Defendants. | |

## COLLECTIVE COMPLAINT FOR WAGES OWED

KIMBERLY BROWN, Plaintiff, by and through her undersigned counsel and The Law Offices of Peter T. Nicholl, hereby submits her Complaint against DRS. COHEN & NORTON, P.A., d/b/a THE FOOT CENTER OF BEL AIR, DR. PHILLIP M. COHEN and DR. NANCY M. NORTON, Defendants, to recover unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq*. (hereinafter, "FLSA"); unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq*. (hereinafter, "MWHL"); and unpaid wages, treble damages, interest, reasonable attorneys' fees and costs under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl., §§ 3-501, *et seq*. (hereinafter, "MWPCL"), and in support thereof, states as follows:

## INTRODUCTION AND BACKGROUND

This matter stems from the application of a common scheme devised by Defendants to avoid paying Plaintiff and others similarly situated their wages owed. Defendants provide various forms of medical treatment. Their focus is podiatric care. Defendants offer a variety of minimally invasive techniques to treat muscle and joint pain. Defendants' treatment plans stem from their diagnoses of foot and ankle disorders.

Defendants hired Plaintiff and other similarly situated employees to assist with their medical practice. Plaintiff and others similarly situated worked as medical and administrative assistants (hereinafter, "assistants"). Their duties centered on the performance of routine office work.

Defendants failed to properly compensate Plaintiff and other assistants for the work they performed. Defendants completed this illegal act by refusing to pay Plaintiff and other assistants for any time worked over forty (40) hours in a workweek. It is Defendants' company policy to *not* pay their employees overtime wages. This was made clear to Plaintiff and others similarly situated at the time their employment commenced. Yet, Plaintiff and other assistants consistently worked in excess of forty (40) hours each week.

Plaintiff and other assistants were required to start work fifteen (15) minutes prior to the time Defendants' first patient was scheduled. This was typically around 8:15 a.m. Plaintiff and others similarly situated were also prevented from leaving work until approximately thirty (30) minutes subsequent to when Defendants finished treating their last patient. This was often not until 5:30 pm. These conditions led Plaintiff and other similarly situated employees to consistently work overtime.

Defendants' office was also regularly understaffed. Additional staff members were needed in order to meet the demands of Defendants' business. There were numerous patient appointments scheduled daily. Defendants' business also grew over time. However, Defendants failed to hire a sufficient number of medical and administrative assistants to help manage their practice. These circumstances resulted in Plaintiff and others similarly situated having to routinely work hours outside of their schedules.

Throughout their employment, Plaintiff and other assistants were required to submit hand-written time-sheets. The time-sheets clearly documented all of the hours they worked. Defendants required Plaintiff and other assistant to "log in" each morning and to "log out" when they left. As such, Defendants were well aware of the overtime hours worked by their employees.

Defendants' knowledge of this fact did not alter their pay practices. Defendants sill failed to properly compensate their assistants. Plaintiff and others similarly situated failed to be compensated at a rate of "time-and-half" their regular rate when they worked over forty (40) hours in a week.

Plaintiff consistently complained of her failure to be properly compensated. Her complaints were repeatedly made to Defendants. This transpired for the duration of Plaintiff's employment. Plaintiff's complaints did not result in her receipt of overtime wages. To the contrary, her requests to be properly compensated led to her termination. Plaintiff was fired for simply demanding the wages to which she was entitled.

Plaintiff is the victim of retaliation. She and others similarly situated have also not received all wages owed to them under both federal and state law. Through these unlawful practices, Defendants evaded the payment of wages owed to Plaintiff and others similarly situated. This directly contravenes the standards set forth by the FLSA, MWHL and the MWPCL. Defendants are currently engaged in this unlawful activity.

## THE PARTIES

1.      Plaintiff Kimberly Brown (hereinafter, "Plaintiff") is an adult resident of Harford County, Maryland.

2.      Defendant Drs. Cohen & Norton, P.A., d/b/a The Foot Center of Bel Air, (hereinafter, "Foot Center" or "Defendant") is an incorporated for-profit business. Defendant is a podiatric medical practice.

3.      Defendant Dr. Phillip Cohen, DPM (hereinafter, "Dr. Cohen" or "Defendant") is an adult resident of Baltimore County, Maryland. Dr. Cohen is a co-owner and co-operator of the Foot Center. He is responsible for the policies and procedures that gave rise to this Complaint.

4.     Defendant Dr. Nancy Norton, DPM (hereinafter, "Dr. Norton" or "Defendant") (hereinafter collectively referred to as "Defendants"[1]) is an adult resident of Baltimore County, Maryland.  Dr. Norton is a co-owner and co-operator of the Foot Center.  She is also responsible for the policies and procedures that gave rise to this Complaint.

5.     Defendants perform podiatric medicine in the south Bel Air area.  They specialize in the treatment of the foot and lower extremities.  Their office is located at 2208 Old Emmorton Road, Bel Air, Maryland 21015.

6.     Due to the nature of their business, Defendants are subject to the FLSA, MWHL and the MWPCL.  Defendants' business meets the definition of a retail or service establishment.

7.     Defendants are subject to the FLSA, MWHL and the MWPCL.  Defendants' annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

8.     Based on the nature of the duties performed by Plaintiff as part of her employment with Defendants, at all times relevant to this Complaint, Plaintiff engaged in interstate commerce.

9.     Plaintiff worked for Defendants who, at all times throughout Plaintiff's employment, fell within the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

10.    At all times relevant, Plaintiff and other similarly situated employees worked as non-exempt employees for Defendants.

---

[1] Hereinafter, any reference to Defendants shall include the Foot Center's corporate officers and all those empowered to act as agents of the corporation, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency.  To the extent individual agents of Foot Center are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendants."  The term "Defendants" shall also include both Dr. Cohen and Dr. Norton.  An individual Defendant shall be specified to the extent that that Defendant is solely responsible for any allegation contained herein.  Unless otherwise specified, the term "Defendants" incorporates all Defendants named herein under the doctrine of "joint and several" liability.

11.     From approximately April 1, 2014 until November 9, 2016, Plaintiff was employed with Defendants.  Plaintiff performed duties specific to her role as an administrative and medical assistant.

12.     Plaintiff typically worked Monday through Friday. Her duties were performed entirely at Defendants' office.

13.     At all times relevant to this Complaint, Defendants controlled the administration of their business and set employee schedules, including those of Plaintiff and others similarly situated.

14.     Defendants were, individually and together, actively engaged in the management and direction of Plaintiff and other similarly situated employees.

15.     Defendants possessed and exercised authority to determine the hours worked by Plaintiff and others similarly situated.

16.     Defendants had the authority to control Plaintiff's tasks and the tasks of others similarly situated.

17.     Defendants had and exercised the power and authority to change the course of Plaintiff's and other similarly situated employees' duties.

18.     Plaintiff and members of the putative class recognized Defendants' authority and obeyed Defendants' instructions.

19.     Defendants made all decisions relating to Plaintiff's and other similarly situated employees' rates and methods of pay.

## JURISDICTION AND VENUE

20. Original jurisdiction in this Honorable Court is expressly provided by the FLSA, 29 U.S.C. § 207, *et seq*. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

21. Discretionary supplemental jurisdiction of Plaintiff's Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiff's federal claims are based.

22. Furthermore, no reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

23. Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred within the State of Maryland. Additionally, Plaintiff is a resident of the State of Maryland and has been for the entirety of the relevant period.

24. This Honorable Court has personal jurisdiction over Defendants; (i) Defendant Foot Center is incorporated under the laws of Maryland, (ii) Defendants Dr. Cohen and Dr. Norton are residents of the State of Maryland and (iii) Defendants conduct sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

25. Defendants specialize in the treatment of the foot, ankle and lower extremities. Defendants maintain a medical office for purposes of providing care to patients that suffer from

podiatric ailments. Defendants hired Plaintiff and other similarly situated employees to assist with their practice.

26. Plaintiff and others similarly situated were employed as medical and administrative assistants. During the course of their employment, they performed administrative duties relating to interacting with patients. This consisted of checking patients in and out of doctor visits, scheduling patient appointments and procuring demographic information.

27. Other administrative tasks entailed input processing and data entry, obtaining medical forms, verifying insurance coverage and processing billing paperwork.

28. Plaintiff and others similarly situated were also required to perform menial office work. This included answering the phones, sending and receiving faxes and making copies.

29. Plaintiff and other similarly situated employees were also required to assist with medical appointments. This primarily involved obtaining medical forms and other documents from patients. This was required so that Defendants could complete their medical exams. Defendants' policies required that certain documents be prepared and collected prior to when a patient received treatment.

30. Plaintiff and others similarly situated could be asked to take a patient's vital signs.

31. Plaintiff and other similarly situated employees would also assist patients with the purchase of various medical products sold by Defendants.

32. During her tenure, Plaintiff performed both administrative and medical tasks. There were three (3) specific positions she held during her employment.

33. When she began, Plaintiff held the position of "runner." As a runner, Plaintiff was primarily tasked with bringing patients back to Defendants' examination rooms. Plaintiff would

then take the patients' vitals in order to prepare them for treatment. Plaintiff was also charged with procuring medical forms needed to complete an exam.

34. Plaintiff also held the title of "receptionist." Throughout her employment, Plaintiff was required to cover the front desk. Plaintiff was primarily tasked with greeting patients and collecting co-pays. Plaintiff was also responsible for making calls to Defendants' patients in order to remind them of upcoming appointments.

35. The receptionist position also entailed many billing-related tasks. This primarily entailed having to communicate with insurance adjusters. Plaintiff had to regularly verify insurance coverage in order to procure payments on a patient's behalf.

36. Many of Plaintiff's billing-related functions required a significant amount of data entry. Plaintiff was consistently charged with inputting information regarding a patient's insurance into Defendant's software.

37. During the latter part of her employment, Plaintiff also held the position of "office manager." She had the additional tasks of having to make the schedules for other administrative and medical assistants.

38. As the office manager, Plaintiff also had to produce the "end of day report." The report consisted of a daily accounting of all patients that were treated and all products that were purchased.

39. Verifying information entered by other administrative assistants was another task specific to the position of office manager. Plaintiff had to correct any mistakes that were made by other staff members.

40. Plaintiff and other similarly situated employees' duties did not require any specialized or advanced knowledge.

41.     Plaintiff and others similarly situated did not perform any analysis.

42.     Plaintiff and other assistants did not interpret any information.

43.     Plaintiff and others similarly situated did not write any reports.

44.     Plaintiff and other similarly situated employees made no medical recommendations.

45.     Plaintiff and others similarly situated satisfied the requirements of their job and adequately performed their duties to benefit Defendants.

46.     Plaintiff and other assistants performed their duties to the extent required by Defendants.

47.     When her employment began, from approximately April 1, 2014 until April 1, 2015, Plaintiff received bi-weekly payments reflecting a pay rate of approximately twelve dollars ($12.00) per hour.

48.     Plaintiff subsequently received a raise and from approximately April 1, 2015 until April 1, 2016, Plaintiff received bi-weekly payments reflecting a pay rate of approximately thirteen dollars and fifty cents ($13.50) per hour.

49.     On approximately August 1, 2016, Plaintiff was promoted to the positon of office manager.  With this promotion, she began to receive bi-weekly payments reflecting an hourly rate of approximately sixteen dollars and thirty-five cents ($16.35).  Plaintiff received this rate of pay until November 9, 2016, the date she was terminated.

50.     For the duration of her employment, Plaintiff worked as an hourly employee for Defendants.  Others similarly situated were paid in the same manner.

51.     Upon the commencement of their employment, Defendants informed Plaintiff and other similarly situated employees that they were to work five (5) days a week.

52.     Based on the schedule described below, Plaintiff and others similarly situated were supposed to work thirty-eight and a half (38.5) hours each week.  However, the hours they actually worked were far in excess.

53.     During many pay periods, Plaintiff and other similarly situated employees worked well over forty (40) hours in a workweek.   For the duration of her employment, Plaintiff consistently worked as many as forty-two (42) to forty-five (45) hours each week.

54.     When their employment began, Plaintiff and other similarly situated employees were not given a set schedule.  The schedule they worked weekly aligned with Defendants' office hours.

55.     Defendants informed Plaintiff and others similarly situated that on Mondays, Wednesdays and Thursdays, the office was typically open from 8:30 a.m. until 4:30 p.m.  At the onset of their employment, Plaintiff and others similarly situated were told that these hours also denoted their schedule.

56.     On Tuesdays, Defendants office was open from 8:30 a.m. to 4:30 p.m., or from 10:00 a.m. to 6:00 p.m.  When their employment commenced, Plaintiff and other similarly situated employees were told that on Tuesdays, they would be expected to work one of the aforementioned shifts.

57.     On Fridays, Defendants' office hours were from 8:30 a.m. to 3:00 p.m.  At the time their employment began, Plaintiff and others similarly situated were told that these hours denoted their schedule.

58.     Plaintiff and others similarly situated were advised that their workday would begin approximately fifteen (15) minutes prior to when Defendants' first patient appointment was

scheduled. Plaintiff and other similarly situated employees were also instructed that their workday would end approximately thirty (30) minutes subsequent to Defendants' last appointment.

59. Frequently, Defendants' first patient appointment was scheduled at 8:30 a.m. Therefore, Plaintiff and other assistants would regularly begin their workday by 8:15 a.m.

60. There were also times that Defendants scheduled appointments prior to the time that their office was officially open. These periods resulted in Plaintiff reporting to work as early as 8:00 a.m. Other similarly situated employees reported at this time as well.

61. Defendants' last appointment was typically scheduled at 4:30 p.m. Thus, Plaintiff and others similarly situated could typically not leave work until 5:00 p.m. There were occasions when they were forced to leave even later.

62. Defendants' physicians were also regularly late to their appointments. It was common for Defendants to run behind schedule. This resulted in patients regularly being treated after business hours. When this occurred, Plaintiffs and others similarly situated were required to stay late. Thus, departing from work at 5:15 p.m. or later was a consistent practice for Plaintiff.

63. Plaintiff and other medical and administrative assistants consistently worked the above schedule Mondays through Fridays.[2] As such, during many pay periods, Plaintiff and others similarly situated consistently worked well over forty (40) hours in a week.

64. There were additional tasks Plaintiff and other assistants had to complete. Once Defendants' physicians were done treating a patient, Plaintiff and other similarly situated employees had to clean and prepare the exam rooms. This primarily consisted of sterilizing patient chairs and medical instruments. Plaintiff and other assistants also had to re-stock the patient rooms with medical supplies. They were also responsible for putting away the medical equipment once

---

[2] The allegations regarding Plaintiff and other similarly situated employees having to arrive to work early and stay late are also attributable to the times they were scheduled to work the 10:00 a.m. to 6:00 p.m. shift on Tuesdays.

all patient exams were finished. Plaintiff and other assistants often had to complete these tasks well past the time Defendants' office had closed. Completing these tasks after business hours contributed to the overtime hours worked by Plaintiff and other assistants.

65.     Understaffing also required Plaintiff and other similarly situated employees to work in excess of forty (40) hours per week. For the duration of Plaintiff's employment, there were only two (2) runners and one (1) receptionists staffed at Defendants' office. There were not enough medical or administrative assistants staffed to meet the demands of Defendants' busy practice.

66.     Understaffing often resulted in Plaintiff and other assistants regularly having to perform additional tasks each day. This caused Plaintiff and others similarly situated to fall behind on their other assignments. This in turn resulted in Plaintiff and other assistants having to work even later to complete all of their assigned duties. This contributed to the overtime hours Plaintiff and other similarly situated employees worked each week.

67.     Due to the persistent issues with understaffing, Plaintiff and others similarly situated often had to work through their lunch breaks in order to complete all of their tasks. It was routine for Plaintiff and other assistants to work non-stop.

68.     Plaintiff's promotion to office manager also caused her to work overtime. The promotion caused Plaintiff's workload to increase immensely. She became responsible for completing more and more tasks. This included collecting payments specific to co-pays and product purchases, in addition to verifying insurance coverage. Because of all of her tasks, Plaintiff was required to work extended hours.

69.     As described above, as the office manager, Plaintiff had to print the "end of day report." To complete this task, Plaintiff had to remain at work until Defendants were done treating their last patient. Following a treatment, patients would often purchase some of the products

offered by Defendants.  Plaintiff had to account for all of these purchases.  The end of day report documented all purchases made.  As such, it could only be printed following the treatment of the final patient.  This resulted in Plaintiff having to stay well past the time Defendants' offices closed.  Once Defendants were done treating their last patient, Plaintiff had to then check and see if the patient was going to make a purchase.  This further contributed to the overtime worked by Plaintiff.

70.    As the office manager, Plaintiff was also responsible for checking the work completed by other medical and administrative assistants.  This was primarily in reference to the billing reports the assistants had to submit.  The reports were specific to patient bills.  Plaintiff had to check whether the reports were filled out according to Defendants' specifications.

71.    It was common for the assistants to make mistakes regarding the information entered on the billing reports.  Plaintiff was responsible for correcting these mistakes.  Having to correct these mistakes was often very time-consuming.  It required that Plaintiff communicate with insurance representatives frequently throughout her day.  Plaintiff can recall having to regularly stay on the phone with representatives for extended periods.  This caused Plaintiff to work additional overtime hours.

72.    As the office manager, Plaintiff had the added task of making the schedules of other medical and administrative assistants.  It was also a requirement that Plaintiff ensure that Defendants' appointment book was in order for the next day.  In addition to the numerous other duties that Plaintiff was assigned, this task was also very time-consuming.  It again required Plaintiff to spend a lot of time on the phone.  These phone calls would often last longer than expected.

73.     In addition, tracking down patients to confirm patient appointments could often not be completed until after business hours.  Many of Defendants' patients were not available until after Plaintiff's shifts were scheduled to close.  This factor also caused Plaintiff to work overtime consistently.

74.     As a result of all the aforementioned circumstances, Plaintiff regularly worked over forty (40) hours per workweek.  Other similarly situated employees were required to work overtime for the same reasons.  However, Defendants refused to pay Plaintiff and others similarly situated for the overtime hours they worked.

75.     Upon the commencement of their employment, Defendants made clear to Plaintiff and others similarly situated that it was Defendants' company policy to not pay overtime.  Plaintiffs can recall both Defendants Dr. Cohen and Dr. Norton making such statements.  Thus, for their entire employment period, Plaintiff and other assistants were not compensated at a rate of "time and a half" when they worked in excess of forty (40) hours in a week.

76.     There is no bona fide dispute that Plaintiff and other similarly situated employees are owed overtime wages for all hours worked over forty (40) in a workweek.

77.     Defendants knew, or should have known, that Plaintiff and other similarly situated employees were entitled to overtime compensation.

78.     In bad faith, Defendants withheld these wages.

79.     The duties performed by Plaintiff and others similarly situated did not implicate any exemptions contained within the FLSA, MWHL, or the MWPCL.

80.     Plaintiff's and other similarly situated employees' responsibilities did not require an advanced degree or specialized intellectual instructions.

81.     Plaintiff and others similarly situated retained no discretion in the performance of any of their tasks.

82.     Plaintiff and other similarly situated employees were always paid an hourly rate. This eliminates any potential justification for Plaintiff and other assistants to have not been paid overtime wages when they worked over forty (40) hours.

83.     Defendants knew, or should have known, that Plaintiff and others similarly situated customarily worked over forty (40) hours per week.

84.     Defendants suffered and/or permitted Plaintiff and other assistants to work these overtime hours.

85.     Defendants were well aware that Plaintiff and other assistants were typically required to report to work prior to the time that Defendants' office was officially open.

86.     Defendants were also aware that Plaintiff's and other similarly situated employees' duties required them to remain at work after the time their office closed.

87.     Plaintiff's presence during both morning and evening hours was made clear to Defendants.

88.     Defendants also used time-keeping software to track their employees' hours. Defendants demanded that Plaintiff and other similarly situated employees "clock in and out" using the time-keeping system at the start and close of each shift.

89.     Plaintiff and others similarly situated had to "sign in and out" each day so that their presence could be confirmed.

90.     Plaintiff and others similarly situated also regularly submitted hand written time-sheets to Defendants.  The time-sheets were specifically given to Dr. Cohen.  This too was for purposes of tracking when Plaintiff and others similarly situated began and ended their workdays.

91.     It was Plaintiff's practice to record all of her hours on the time-sheets.   Other similarly situated employees followed this same practice.   Therefore, Defendants were consistently made aware of the overtime hours their employees worked.   Defendants also knew that these same employees were not receiving overtime payments.

92.     In lieu of overtime, Defendants implemented a system they labeled as "comp time." Plaintiff and others similarly situated were given the option of taking off a day that they would typically be scheduled to work.   This was to account for the overtime wages Plaintiff and other similarly situated employees were routinely denied.

93.     Due to the requirements of their position, Plaintiff and other similarly situated employees actually taking a day off from work rarely transpired.   There was always a shortage of administrative/medical assistants scheduled to work at Defendants' office.   These conditions inhibited the assistants from taking many days off.

94.     Due to the demands of their employment, Defendants were aware that Plaintiff and other administrative staff members were regularly unable to take advantage of the supposed "comp time" promised.

95.     The disorganization within Defendants' office further prevented Plaintiff from taking many compensatory days.   For instance, the manner in which Defendants tracked Plaintiff's and other assistants' "comp time" was very informal.   Defendants did not implement specific policies to accurately track the "comp time" Plaintiff and others similarly situated had earned. These circumstances further hindered Plaintiff and other assistants from taking a lot of time off.

96.     Once Plaintiff was promoted to office manager, taking compensatory days off became even more difficult.   Due to the added responsibilities required of the position, Defendants frowned upon Plaintiff missing work.

97.     Additionally, when Plaintiff and other similarly situated employees were able to take advantage of their accrued "comp time," it was routine for the time off to not occur in the same workweek where the overtime hours had been worked.

98.     Due to all the aforementioned circumstances, Defendants supposed compensatory plan failed to properly reimburse Plaintiff with the overtime wages she earned.  For these same reasons, Defendants other administrative staff members were also not properly compensated.

99.     It is also unlawful to substitute compensatory time for overtime pay to begin with. While the FLSA provides for the institution of a "comp time" system, such a system is only available to a "public agency."  Defendants are not a public agency.  Therefore, Defendants cannot lawfully substitute "comp time" for monetary overtime payments owed to non-exempt employees such as Plaintiff.  Defendants are, or should be, well aware of this fact.

100.     For the duration of her employment, Plaintiff consistently inquired about the wages missing from her paychecks.  Other similarly situated employees made repeated inquiries as well. These inquiries did not result in their receipt of overtime wages.  Defendants continuously refused to pay their employees for the extra hours they worked.

101.     Plaintiff's repeated requests for back wages eventually led to her termination.

102.     Plaintiff was fired on November 9, 2016. This was the sole result of her continued requests for overtime payments.[3]

103.     Consequently, Plaintiff, on behalf of herself and all those similarly situated, seeks the wages she is entitled and all other relief available through this Complaint.

---

[3] Subsequent to her termination, Defendants submitted a partial payment to Plaintiff that was to supposedly account for the overtime wages she accrued throughout her employment.  However, said payment represents only a fraction of the back wages Plaintiff is entitled to.  The monies offered to Plaintiff is just another example of Defendants' attempt to cheat Plaintiff out of the wages she rightfully earned.  Such an offering also negates any attempt to argue that the violations complained of herein were anything but willful.

## FLSA COLLECTIVE ACTION ALLEGATIONS

104.     Plaintiff and other similarly situated employees work or worked as medical and/or administrative assistants for Defendants. The positions they all held included that of runner, receptionist and office manager.

105.     The FLSA requires employers to compensate non-exempt employees such as Plaintiff and others similarly situated overtime wages for all hours worked over forty (40) within a workweek.

106.     Defendants knew that Plaintiff and similarly situated employees typically worked over forty (40) hours per week.

107.     Defendants suffered or permitted Plaintiff and other similarly situated technicians to work more than forty (40) hours per week.

108.     Defendants knew or should have known that Plaintiff and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

109.     Pursuant to the FLSA, Plaintiff commences this collective action against Defendants on behalf of himself and those similarly situated.

110.     Plaintiff demands damages reflecting an overtime rate of not less than one and a half (1.5) times her regular rate of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations. Plaintiff makes these same demands on behalf of all members of the putative collective.

111.     Plaintiff consents to be party plaintiff in this matter. Plaintiff's consent form is attached to this Complaint as Exhibit A.

112.     It is likely that other individuals will join Plaintiff during the litigation of this matter and file written consents to "opt in" to this collective action.

113.    There are similarly situated current and former employees of Defendants that have been harmed by Defendants' common scheme to underpay its employees and violate the FLSA.

114.    These similarly situated persons are known to Defendants and are readily identifiable through Defendants' records.

115.    Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

116.    Upon information and belief, others will choose to join Plaintiff in this action against Defendants and opt in to this lawsuit to recover unpaid wages and other available relief.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### *As to All Defendants Jointly and Severally*

### *Count I - Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiff and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become a Party Plaintiff*

117.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

118.    Plaintiff is entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

119.    As described above, Plaintiff has not received from Defendants compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a workweek; Defendants failed to compensate Plaintiff for these additional hours.

120.    Defendants willfully and intentionally failed to compensate Plaintiff for the overtime wages she is owed.

121.     There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendants.

122.     Under the FLSA, Plaintiff is entitled to additional wages from Defendants to compensate her for the hours she worked in excess of forty (40) in a workweek at a rate of one and one-half (1.5) times her regular hourly wage rate.

***Count II.  Violation of MWHL: Failure to Pay Overtime Wages to Plaintiff, all those that are Joined as Party Plaintiffs in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court***

123.     Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

124.     Pursuant to Md. Code Ann., Lab. & Empl. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

125.     Pursuant to Md. Code Ann., Lab. & Empl. § 3-420(a), an employer shall compute the wage for overtime under Md. Code Ann., Lab. & Empl. § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

126.     Plaintiff has not received compensation from Defendants reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

127.     Defendants willfully and intentionally did not compensate Plaintiff for the overtime wages she is owed.

128.     There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendants.

129.     Under MWHL, Plaintiff is entitled to additional wages from Defendants for all overtime hours worked at a rate of one and one-half (1.5) times her regular hourly wage rate.

***Count III - Violation of the MWPCL: Failure to Pay Wages Owed at the Termination of Their Employment to Plaintiff, all those that are Joined as Party Plaintiffs in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court***

130.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

131.    Plaintiff is entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501, *et. seq.*, which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.

132.    Plaintiff has not received compensation from Defendants for all wages owed for work performed before the termination of her employment as required by Md. Code Ann., Lab. & Empl. §3-505(a).  This is specific to Defendants' failure to pay Plaintiff the overtime wages to which she is entitled.

133.    Defendants willfully and intentionally did not compensate Plaintiff for the wages owed to her and continued to violate the MWPCL, even after Plaintiff informed Defendants of the violation.

134.    Under the MWPCL, there is no bona fide dispute that Plaintiff is owed wages for work performed while employed by Defendants.

***Count IV.   Violation of the FLSA: Retaliation Against Plaintiff for Her Complaints Made to Defendants for Her Wages Owed***

135.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

136.    The FLSA prohibits an employer from discharging or discriminating against any employee because such employee filed a complaint, or instituted, or caused to be instituted, any

proceeding related to unpaid minimum and/or overtime wages owed to an employee under the FLSA. 29 U.S.C. § 215(a)(3).

137.     An employer in violation of 29 U.S.C. § 215(b)(3) is liable for such legal or equitable relief as may be appropriate to effectuate the purpose of said provision.

138.     As described above, Plaintiff made numerous complaints to Defendants regarding her missing wages.

139.     Plaintiff was promptly terminated under the pretense that she had brought her personal life into the workplace.

140.     This pretense was used as a ruse for purposes of disguising Defendants' blatant retaliation against Plaintiff for attempting to exercise the rights guaranteed to her by the FLSA and MWHL.

141.     Such retaliation amounts to a willful violation of the FLSA, for which Plaintiff is entitled to recover legal or equitable relief appropriate to effectuate the purpose of Section 15(a)(3), including the payment of lost wages and an equal amount in liquidated damages, as well as attorneys' fees and costs. *See* 29 U.S.C. § 216(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and others similarly situated, prays for the following relief:

a)      In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiff and those similarly situated;

b)      Ordering Defendants to disclose in computer format, or in print if no computer readable format is available, the names, addresses and emails of all those individuals who are similarly situated and permitting Plaintiff to send notice of this action to all those similarly situated individuals;

c)      Designating the named Plaintiff to act as a class representative on behalf of all similarly situated employees for the FLSA collective class;

d)      Judgment against Defendants for its failure to pay Plaintiff and those similarly situated in accordance with the standards set forth by the FLSA;

e)      Judgment against Defendants for its failure to pay Plaintiff and those appropriately joined to this matter in accordance with the standards set forth by MWHL;

f)      Judgment against Defendants for its failure to pay Plaintiff and those appropriately joined to this matter in accordance with the standards set forth by the MWPCL;

g)      Judgment against Defendants and classifying their conduct as willful and not in good faith;

h)      Judgment against Defendants and classifying Plaintiff, the collective class and those appropriately joined in this matter as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

i)      An award against Defendants for the amount of unpaid overtime wages owed to Plaintiff and those similarly situated, calculated at a rate that is not less than one and a half (1.5) times Plaintiff's and other similarly situated employees' regular hourly rate for all overtime hours worked;

j)      An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiff, those similarly situated and those properly joined in this matter, whichever is deemed just and equitable by this Honorable Court;

k)      An award of back-pay equal to forty (40) hours at Plaintiff's regular hourly rate per week, beginning on the day Plaintiff was terminated and running until final judgment is rendered;

l)      An award of liquidated damages equal to the total amount of back-pay owed to Plaintiff as a result of her retaliatory termination;

m)      Injunctive relief in the form of full reinstatement of Plaintiff in Defendants' employ, at her prior hourly rate, as permitted by 29 U.S.C. § 215(b)(3);

n)      Injunctive relief in the form of an order prohibiting Defendants from violating the FLSA, MWHL and the MWPCL in the future;

o)      An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendants;

p)      Leave to add additional Plaintiffs to all claims by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

q)      All further relief deemed just and equitable by this Honorable Court.

## **REQUEST FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests that a jury of her peers hear and decide all possible claims brought on behalf of Plaintiff and those similarly situated.

Respectfully submitted,

*/s/ Benjamin L. Davis, III*
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
George E. Swegman, Esq. (19444)
gswegman@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-8454

*Attorneys for Plaintiff*